# Illinois Official Reports

## Appellate Court

***In re Audrey B.*, 2015 IL App (1st) 142909**

| | |
|---|---|
| Appellate Court Caption | *In re* AUDREY B., a Minor (The People of the State of Illinois, Plaintiff-Appellee, v. Michael C., Respondent-Appellant). |
| District & No. | First District, Fourth Division<br>Docket No. 1-14-2909 |
| Filed | April 30, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 13-JA-701; the Hon. Nicholas Geanopoulos, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Abishi C. Cunningham, Jr., Public Defender, of Chicago (Trenis Jackson, Assistant Public Defender, of counsel), for appellant.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Nancy Kisicki, and Nicole Lucero, Assistant State's Attorneys, of counsel), for the People.<br><br>Robert F. Harris, Public Guardian, of Chicago (Kass A. Plain and Lynn Pavalon, of counsel), guardian *ad litem*. |
| Panel | JUSTICE HOWSE delivered the judgment of the court, with opinion.<br>Justices Ellis and Cobbs concurred in the judgment and opinion. |

**OPINION**

¶ 1    On August 1, 2014, the State filed a petition for adjudication of wardship of Audrey B., born November 25, 2011, and a motion for temporary custody. The same day, the circuit court of Cook County entered an order granting temporary custody of Audrey to the Illinois Department of Children and Family Services (DCFS) guardianship administrator, and an order appointing the Cook County public guardian as attorney of record and guardian *ad litem* for Audrey. On August 19, 2014, following a hearing, the court entered an adjudication order finding that Audrey was abused and neglected as defined in section 2-3 of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3 (West 2012)). The court set the matter for a dispositional hearing.

¶ 2    On September 3, 2014, following the dispositional hearing, the trial court found respondent, Michael C., was unable and unwilling to care for, protect, train, or discipline the minor and adjudged Audrey a ward of the court. The court placed Audrey in the custody and guardianship of the DCFS guardianship administrator with the right to place the child and set the matter for a permanency planning hearing on March 4, 2015. On September 19, 2014, Michael C. filed a notice of appeal from the court's September 3, 2014 judgment. For the following reasons, we affirm.

¶ 3                                    BACKGROUND

¶ 4    Michael is Audrey's father and primary caretaker. Her mother, also named Audrey B., is not a party to this appeal. On June 12, 2013, DCFS received a hotline report regarding Audrey alleging bone fractures, medical neglect, and cuts, welts, and bruises. The same day, Carolyn Hudgins-Teil, a DCFS child protection investigator, responded to Roseland Hospital (Roseland). Hudgins-Teil spoke to Michael at Roseland. On the evening of June 12, 2013, Michael told Hudgins-Teil that on June 11, 2013, he had taken Audrey to a park and that Audrey had fallen three times while trying to walk and run. Michael told Hudgins-Teil that the first fall resulted in a bruise on her nose, the second time Audrey put her hands out to try to catch herself but she fell, and the third time she fell on her side and rolled over. Michael did not state to Hudgins-Teil that Audrey cried after any of the falls. Michael told Hudgins-Teil that he was with Audrey and, other than a bruise to her nose, he did not notice anything wrong with Audrey until 11 p.m. that night when he tried to get Audrey to lay down and she would not lay her arms out.

¶ 5    Michael reported that he lived with his parents. Hudgins-Teil and Michael agreed he would go with his sister and girlfriend to take Audrey to University of Chicago Medicine Comer Children's Hospital (Comer) the next day for a second opinion as to what happened to Audrey. Hudgins-Teil had no further involvement in the case.

¶ 6    On June 14, 2013, DCFS assigned Lisa Maltbia to Audrey's case. That day, Maltbia spoke to Dr. Ramaiah from Comer and met with Michael and his parents at his parents' home. Michael told Maltbia that on June 11, 2013, he had taken Audrey to the park and she fell and scraped her nose. Michael told Maltbia that as they were approaching a set of stairs to leave the park, Audrey fell and braced herself. Then, as they approached their residence, he and Audrey were playing and she fell, braced herself, and flipped over into the grass. Michael told Maltbia that when Audrey fell the third time, Michael picked her up by both hands. Michael told Maltbia that when they returned home he gave Audrey to his sister and he left the residence.

Michael told Maltbia that he did not have any contact with his family between the time he left the residence and 7 a.m. the next morning. Michael's sister had called him at 6 a.m. but he missed her call. Michael's mother called him at approximately 7 a.m. and told him that Audrey needed to go to the hospital. Michael told Maltbia that Audrey fell frequently but other than a fall about two weeks earlier, when she fell on her stomach running from the family dog, he did not give specific dates or provide details.

¶ 7    On July 13, 2013, Maltbia spoke to Michael again. Michael told Maltbia that he was Audrey's primary caretaker and that he was the person who always bathed, clothed, and fed her. By this time, Maltbia had learned that Audrey had a fracture to her collarbone that predated their first interview. When Maltbia asked Michael about the collarbone injury Michael said he had no knowledge of that injury and he did not observe anything in Audrey's demeanor that indicated she had any type of injury or pain.

¶ 8    The trial court qualified Dr. Veena Ramaiah as an expert in pediatric medicine, pediatric emergency medicine, and child abuse pediatrics. Dr. Ramaiah is an attending physician in the pediatric emergency room and is an attending physician on the child protective services team (CPS). Dr. Ramaiah consulted as a member of CPS when Audrey went to the emergency room at Comer. Dr. Ramaiah was not able to speak to Michael that day because he was not present. Pursuant to their protocol, the team at Comer requested a skeletal survey to look for additional injuries. The skeletal survey and other imaging surveys of Audrey revealed four bone fractures in Audrey's arms. Audrey had fractures on two forearm bones (the radius and ulna) in both her left and right arm.

¶ 9    Dr. Ramaiah testified that the arm fractures were less than 7 to 10 days old. She testified these fractures were unusual in that they were bilateral fractures–meaning fractures on both arms. Dr. Ramaiah testified that usually when children fall they fall on one arm. She also testified that a ground-level fall on an outstretched hand can cause the type of fracture Audrey had in a child her age, but that it is unusual to have fractures in both arms. A radius-ulna fracture is common in children Audrey's age but a bilateral radius-ulna fracture occurs very rarely. Dr. Ramaiah testified that she has seen a bilateral injury in the context of an automobile accident. Dr. Ramaiah described Audrey's injuries as mirror-image, which she testified meant the injuries were fairly symmetric and looked almost the same on both arms. Audrey's fractures occurred at approximately the same distance from her wrist in both arms. Dr. Ramaiah testified that bilateral fractures are often asymmetric. Dr. Ramaiah testified she had only seen mirror image bilateral fractures in the context of a "much more significant impact." Dr. Ramaiah testified that in her experience in the emergency room, pediatric emergency room, and on the CPS she has never seen bilateral mirror-image radius and ulna fractures caused by just a ground-level fall. She testified that most of the mechanisms of bilateral fractures are high velocity. She did not come across case reports of bilateral forearm fractures in children resulting from ground-level falls.

¶ 10    Dr. Ramaiah testified that if someone were to inflict injuries of the type Audrey had in her arms it would require a direct impact across both arms at the same level or taking the bones and bending them back the wrong way. Dr. Ramaiah opined to a reasonable degree of medical certainty that simply lifting the child by the wrists in a reasonable manner would not cause these types of injuries. An adult could generate enough force while bending the child's arms back to account for Audrey's injuries. (Although it was not Dr. Ramaiah's opinion to a reasonable degree of medical certainty that was what occurred in this case.) She testified that

bilateral fractures could occur from a fall, although she had never seen a case where that happened. Audrey would experience pain if someone was to pick her up by her arms or hands if her arms were broken. She would be able to do something with her hands but she would not be able to pull herself up or grab things while playing if her arms were broken.

¶ 11 Audrey's skeletal survey also revealed a healing clavicle fracture on her left side. The two pieces of bone were completely separated. Dr. Ramaiah testified that clavicle injuries are common in children and can occur from a fall. She testified Audrey's clavicle injury was at least 7 to 10 days old at the time of the skeletal survey because callous had begun to form. She consulted with an orthopedist who estimated that Audrey's injury was two to six weeks old. Dr. Ramaiah learned that, about a week or two earlier, Audrey had been playing with the family dog and fell.

¶ 12 Dr. Ramaiah testified that with a collarbone injury movement of the shoulder and lifting of the arm would create pain. Dr. Ramaiah testified:

"I would imagine that anybody who was changing her shirt, where you would have to lift her arm up or if you're bathing her, since she's completely dependent on you, I would hope would have noticed pain."

¶ 13 Dr. Ramaiah found it hard to believe that a child as young as Audrey would go for as long as her injury existed with no one noticing that Audrey was having some pain with her arm movement. Dr. Ramaiah testified that her opinion to a reasonable degree of medical certainty was that the lack of knowledge of the clavicle fracture was medical neglect because "to not notice that the child can't lift up her arm or that she cries when you do your activities of daily living, to me that seems odd." She also found it concerning that a toddler would have three fractures in such a short period of time.

¶ 14 Dr. Ramaiah testified that she did not have an opinion as to the manner of injury to a reasonable degree of medical certainty. However, she did testify, to a reasonable degree of medical certainty, that it was more likely than not that Audrey's injuries were inflicted rather than not inflicted. Dr. Ramaiah wrote a report in which she stated that Audrey's injuries were "highly suspicious for inflicted injury and at minimum medical neglect." The report stated that the manner of the injury was "indeterminate due to incomplete assessment." On cross-examination, Dr. Ramaiah explained:

"So when my reports end up sounding open ended a bit, in the way this one did, where I couldn't say definitively that this was abuse and I left it at highly suspicious, it is because, honestly and ethically, I can't say definitively one way or the other. I can't say that, oh, no, this was definitely an accident, which I have done, or this was definitely abuse, which I have done.

And so it ends up being in the middle. Because with the information provided and with the investigation that was done that *** there was no one to corroborate the injuries, there was nobody else at the park. I don't know who else the detectives talked to except the family members.

Sometimes the reports do end up a little open-ended because we do have to be honest about what we know and what we don't know."

¶ 15 Dr. Ramaiah also stated that the multiple ground-level falls that were described in the reports by DCFS investigators could account for Audrey's injuries if you look at them

individually. When she was asked whether, in her medical opinion, those explanations were plausible, Dr. Ramaiah responded in part as follows:

"So when you take each individual injury and all those different things that are described, then those injuries are possible in the grand scheme of possibility. But three fractures in a toddler in a short period of time–I mean, not to be facetious, but she's a really unlucky kid. That's what makes it highly suspicious in the symmetrical nature."

¶ 16    Dr. Ramaiah also noted that no specific mechanism of injury was ever identified. She specified that, for example, it was not stated that "Oh, yeah, I saw the child fall and *** she started crying. And I thought something was wrong with her arm and I had her shake it off. There really wasn't any of that. It was just a very nonspecific, 'Oh, she just fell while she was running at the park.' " Dr. Ramaiah concluded that it was her opinion to a reasonable degree of medical certainty that Audrey's injuries were highly suspicious for inflicted injury and it was her medical opinion that it is more likely than not that the falls that were described did not cause Audrey's injuries.

¶ 17    Dr. Christopher Sullivan testified for Michael as an expert in the field of orthopedics and pediatric orthopedics. Dr. Sullivan testified that the fractures in Audrey's left and right forearms were minimally displaced and very similar. He stated that these fractures "are almost always produced by a person falling on an outstretched hand." Dr. Sullivan testified he sees three or four new injuries of that type each week but those are unilateral fractures. He testified that it is "unusual to have both arms broken at the same time. It's unusual to have them exactly symmetric." He could not recall when he saw bilateral fractures of the radius and ulna that were symmetric, but he had seen that type of injury. Dr. Sullivan testified that "her falling and landing with both hands in a protective position" could have accounted for Audrey's injuries.

¶ 18    Dr. Sullivan testified on cross-examination that there was no way to know whether or not Audrey's injuries to her forearms occurred from two separate incidents. He also testified that falling from a standing height is adequate to produce her fractures, and that a greater force would have resulted in greater displacement of the fractures. Audrey's fractures were minimally displaced. Also, if an external force like a rod had hit her "you would expect to see bruising at the area of the fracture site, whereas if the patient is falling on their hands, you wouldn't expect to see bruising at the fracture site." Dr. Sullivan opined that it would be difficult for a person to intentionally produce the exact same injury on both sides. He stated that Audrey's injury was unusual, and that "the most obvious reason to have it is you had the same thing happen to you which means you fell and your hands were out when you fell."

¶ 19    Audrey's clavicle injury was also fairly common and Dr. Sullivan testified that he saw that type of injury approximately twice per month. The outward signs of the clavicle injury would have been that Audrey "would have guarded using the arm initially. So she wouldn't have wanted to do activity that required strength and movement of the arm until it started to get a little bit more stable." Initially, after the fracture, it would have hurt if Audrey were to raise her arm up to or above her shoulder and it would have hurt to touch the area of the fracture. He opined that a reasonable parent taking care of a child with a clavicle fracture could have missed that injury. The patient with the clavicle injury would have only been symptomatic for a couple of days, then she would start using the arm normally and "it would be really difficult to tell that there was anything going on." Dr. Sullivan testified that he has seen multiple clavicle fractures that were not identified until weeks later. His opinion was that missing a clavicle injury for any length of time would not rise to the level of medical neglect.

¶ 20 Dr. Sullivan agreed that each of Audrey's injuries would have caused her to cry when it occurred and that he was aware that Michael did not report that Audrey cried while they were at the park. Dr. Sullivan agreed that no history of any incident that may have caused the radius and ulna fractures was given by a caregiver except what occurred at the park, but he stated that fractures in this age range occur where parents do not observe the episode. Dr. Sullivan testified that Audrey could have been injured in an unobserved fall that was not one of the three Michael described as occurring at the park and that fact would not change his opinion. He opined that this "could have been something pretty minor where the child just fell over and produced these injuries. It doesn't take that much force to produce them."

¶ 21 Dr. Sullivan testified that his opinion to a reasonable degree of medical certainty was that the likelihood that Audrey's forearm injuries were produced by nonaccidental trauma was 1% or 2%. Dr. Sullivan testified that in this case it "probably meets the level of suspicion [for nonaccidental trauma] which is basically greater than random chance." But he added that "having bilateral distal radius fractures would put you in the 2 or 3 percent chance of abuse rather than anything higher." On cross-examination Dr. Sullivan maintained his position, despite being unable to recall the last time he had seen a bilateral radius and ulna fracture. He agreed that multiple injuries in various stages of healing increases the risk for nonaccidental trauma. He also opined that "it's very low likelihood that the clavicle fracture would have been from abuse" because such fractures are "almost always produced by accidental forces rather than nonaccidentally. This is not a fracture that is suspicious for abuse." Dr. Sullivan noted that at least four different adults had been around the child for two to six weeks before the skeletal survey and no one noticed anything going on with her arm. He stated that he must base his opinion as to whether an injury was inflicted or accidental on outside circumstances, including whether someone injured the child or if there is something suspicious about the child. He testified that in this case, "there's barely more suspicion than random chance."

¶ 22 Following arguments by the parties, the trial court announced its ruling. The trial court stated that it would explain the bases for its decisions. The court began by reviewing the pertinent testimony, although the court made clear that failure to mention any piece of evidence in particular should not be construed to mean that the court did not consider that evidence.

¶ 23 The trial court found that it was not incredible that Dr. Ramaiah did not have an opinion about the manner of injury to the clavicle because she was not given a history to explain that injury. The trial court held that there was not sufficient evidence as to the injury to the clavicle to make a finding that it resulted from physical abuse. The court held regarding the injury to the clavicle that it is commonplace enough that there is a plausible explanation and it could have resulted from an accident.

¶ 24 The trial court noted the great difference of opinion between Dr. Ramaiah and Dr. Sullivan with regard to the bilateral symmetrical radius and ulna injuries. The court noted Dr. Ramaiah's testimony that when a person falls, you fall to one side. The court found that "the fact that you would brace yourself identically and hit something just perfectly to cause the exact breaks doesn't seem to make much sense to me." The court stated that it had considered Dr. Sullivan's testimony and found that regarding the bilateral symmetrical radius and ulna injuries it is more likely that they were the result of physical abuse and not an accident.

¶ 25 The trial court found aspects of Dr. Sullivan's testimony troubling. The court found that Dr. Sullivan did not feel that the history given by the father made any difference to his opinion.

The court said that specific aspect of Dr. Sullivan's testimony was troubling because "unless you have an eyewitness who actually observed the injury, then obviously the things you have to take into consideration" are "what are people saying happened to the child beforehand that might account for indicating that it is actually an accident or child abuse." The court found that "[j]ust telling me it's an accident because I say it's an accident is not plausible." The court found that Dr. Sullivan had no basis for his opinion that the likelihood that Audrey's forearm injuries were produced from nonaccidental trauma was 1% or 2% because forearm injuries are almost always produced accidentally in a standing child or a child who is able to stand. The court found that Dr. Sullivan gave no opinion other than he thinks it was an accident and the court did not know how Dr. Sullivan could come up with such an exacting percentage other than "because I say it's an accident."

¶ 26   The trial court also discounted Dr. Sullivan's testimony that the fact Audrey suffered mirror-image bilateral symmetrical fractures was not significant, in part because Dr. Sullivan could not state any time he had seen that same injury. The court stated: "On the one hand to give an opinion that this is something that it's rudimentary and happens all the time, and then not be able to give a time frame when he's even seen something like that, I just find to be less credible than Dr. Ramaiah's testimony regarding that point."

¶ 27   The trial court ruled that the State had proved physical abuse with regard to the forearm injuries by a preponderance of the evidence but stated that it could not name a perpetrator. The court also found that the State proved an injurious environment and substantial risk of injury by a preponderance of the evidence. Specifically, the adjudication order found that Audrey was neglected due to lack of care and an injurious environment (705 ILCS 405/2-3(1)(a), (b) (West 2012)) and abused due to physical injury and a substantial risk of physical injury (705 ILCS 405/2-3(2)(i), (ii) (West 2012)). The court set the matter for a dispositional hearing.

¶ 28   Michael failed to appear at the dispositional hearing. Following testimony by the DCFS employee assigned to Audrey's case and argument by the parties, the trial court ruled that it was in the best interests and welfare of Audrey and the public that she be adjudged a ward of the court. The trial court stated that it would give the parents additional time to engage in services aimed toward reunification. The court placed Audrey in the custody and guardianship of the DCFS guardianship administrator with the right to place the child.

¶ 29   This appeal followed.

¶ 30                                    ANALYSIS

¶ 31   The Act creates a two-step process for deciding whether a minor should be removed from his or her parents' custody and made a ward of the court. *In re Yohan K.*, 2013 IL App (1st) 123472, ¶ 108 (citing 705 ILCS 405/1-1 *et seq.* (West 2010)). The court's primary concern in child custody proceedings under the Act is the best interests and welfare of the child. *In re Gustavo H.*, 362 Ill. App. 3d 802, 812 (2005).

> "[T]he first step is an adjudicatory hearing on the petition for adjudication of wardship. [Citation.] At the adjudicatory hearing, the trial court is to determine whether the child was neglected or abused, not whether the parents were neglectful or abusive. [Citations.] Following the adjudicatory hearing, if the trial court has determined the minor is abused, neglected, or dependent, the trial court moves to the second step of the process, the dispositional hearing. [Citation.] At the dispositional hearing, the trial court is charged with determining whether it is consistent with the health, safety and

- 7 -

best interests of the minor and the public that he [or she] be made a ward of the court. [Citation.]" (Internal quotation marks omitted.) *Yohan K.*, 2013 IL App (1st) 123472, ¶ 108.

¶ 32 Before a court may adjudicate a minor a ward of the court the State has the burden to prove by a preponderance of the evidence that the child was abused or neglected. *In re Malik B.-N.*, 2012 IL App (1st) 121706, ¶ 35. The preponderance of the evidence of abuse or neglect is "that amount of evidence that leads the trier of fact to find abuse or neglect is more probable that not." *Id.* The trial court has broad discretion when making the determination of whether a child has been abused or neglected. *Id.* This court will not disturb the trial court's findings unless they are against the manifest weight of the evidence or the findings are manifestly unjust. *Id.* A finding is against the manifest weight of the evidence if a review of the record makes it clearly evident that the opposite result would be the proper result. *In re M.W.*, 386 Ill. App. 3d 186, 196 (2008); *Yohan K.*, 2013 IL App (1st) 123472, ¶ 110. This deference to the trial court is warranted by its superior ability to observe the witnesses for purposes of assessing credibility to weigh the evidence. *M.W.*, 386 Ill. App. 3d at 196.

¶ 33 Michael argues that the trial court's findings of abuse and neglect are against the manifest weight of the evidence because the court relied upon Dr. Ramaiah's testimony and her opinion was based on a "constellation of injuries." Michael also argues that the court adopted this "constellation of injuries" theory in its ruling and ignored Dr. Sullivan's testimony. Michael argues that although the court denied it relied on a "constellation of injuries" in making its findings, the court merely substituted a "difficult-to-explain" analysis to support its findings, which were nonetheless based on Audrey's multiple injuries. Michael also argues that the court minimized Dr. Sullivan's testimony with regard to Audrey's broken clavicle. Michael argues that because the trial court relied on a constellation of injuries in the absence of evidence of abusive causation of the injuries individually, the court's judgment must be reversed as against the manifest weight of the evidence.

¶ 34 In *Yohan K.*, this court held that "relying on a 'constellation' theory when there is no preponderance of evidence proving abusive causation as to each separate injury is akin to relieving the State of its burden of proof." *Yohan K.*, 2013 IL App (1st) 123472, ¶ 113. In *Yohan K.*, several medical experts testified and offered conflicting explanations for the variety of medical conditions the child endured. In its ruling at the adjudicatory hearing the trial court in *Yohan K.* found that it could be persuaded that the individual conditions could be explained by something other than abuse or neglect but the individual explanations were only possible in the absence of other medical findings. *Id.* ¶ 101. That is, the trial court dismissed a nonabusive explanation for two conditions (intracranial bleeding and retinal hemorrhaging) because that explanation (a congenital abnormality called benign external hydrocephalus or BEH) did not explain a third condition (a possible fracture of the child's left knee). *Id.* ¶ 117. "The [trial] court held that to conclude that all three of these infrequent to rare conditions came together at the same time to explain the minor's condition was not reasonable." (Internal quotation marks omitted.) *Id.* ¶ 101.

¶ 35 On appeal, this court found that the existence of the fracture was essential to the finding the minor was abused because "without a fracture, the 'constellation' theory of abuse falls apart." *Id.* ¶¶ 117-18 (State's expert testified that "if there was no fracture or if there was a diagnosis of rickets [(which would have explained the fracture)], he would have to reevaluate his opinion of 'inflicted trauma' "). This court found that the manifest weight of the evidence did not

support a conclusion that the minor had a fracture. *Id.* ¶ 119. Moreover, this court found that "not one of [the minor's] individual injuries within the constellation had been proven to be by abuse." *Id.* ¶ 146. The *Yohan K.* court found that the trial court had erred in failing to evaluate and weigh the evidence and expert testimony as to each alleged injury and instead allowed the State to elude its burden of proof by claiming that the "constellation" of the minor's injuries created a preponderance of evidence that he was abused. *Id.*

¶ 36        In this case, the trial court addressed this court's decision in *Yohan K.* when it made its oral ruling following the adjudicatory hearing. The court stated "to be clear, the basis of my decision here today has nothing to do with there being any constellation of injuries. In fact, I'm going to separate the injuries, the clavicle injury and the later bilateral symmetric radius and ulna fractures in making my decision." Later, when discussing the relevance of Audrey's multiple injuries, the court stated that "I want to make it very clear for the record that I'm not relying on a constellation of injuries, but even Dr. Sullivan says if you have multiple injuries, that's something that he would consider." The trial court found that this case was much different from *Yohan K.* and stated its reasons for that finding. The court noted the factual differences and that in this case the medical experts did not dispute the existence of the injuries, only whether it was more likely than not they were accidental. The court found that Dr. Ramaiah had not based her opinion on a constellation of injuries in her testimony and stated that the court did not consider any constellation of injuries. The court stated it would not have accepted Dr. Ramaiah's opinions if a constellation of injuries was the whole basis of her opinions.

¶ 37        We find that Dr. Ramaiah did not base her expert medical opinion on a "constellation of injuries" theory. But rather it was the symmetrical nature of Audrey's injuries combined with the absence of an identifiable incident where the minor displayed the effects of the injuries that made them highly suspicious. When asked, "Do you have an opinion to a reasonable degree of medical certainty as to the manner of injury?" Dr. Ramaiah responded forthrightly "I actually don't." Dr. Ramaiah continued: "In isolation, each of these can be caused by low level falls. But when you take them all together and the fact that the history was fairly nebulous in the beginning, I actually don't know exactly what happened to this child." The foregoing statement, upon which Michael based his argument as to Dr. Ramaiah, does not establish that Dr. Ramaiah based her expert medical opinion–that Audrey's forearm injuries were more likely inflicted rather than not inflicted–entirely on the existence of multiple fractures in both forearms or the two forearm fractures combined with the fractured clavicle. Dr. Ramaiah testified that she reached her initial conclusion that Audrey's forearm injuries were highly suspicious for inflicted injury based "on the fact that they were symmetric and bilateral, which is very unusual." Thus, it was not simply the multiplicity of fractures but the fact that the fractures occurred in both forearms at the same distance from the wrist, and that an injury of that type is highly unusual, which raised Dr. Ramaiah's suspicion. Dr. Ramaiah also relied on the absence of a reported incident to which Audrey's injuries could be attributed. The explanation for Audrey's injuries by both Michael and Dr. Sullivan were vague assertions that Audrey fell with her arms outstretched.

¶ 38        There is nothing in Dr. Ramaiah's testimony to suggest that she used the improper reasoning applied in *Yohan K.* to reach her expert medical opinion. Dr. Ramaiah did not conclude that Audrey's forearm injuries resulted from abuse because her falls in the park could not explain all of her injuries; nor did she ignore a nonabuse explanation for one injury because

that explanation could not explain another. Compare *Yohan K.*, 2013 IL App (1st) 123472, ¶ 147 ("the trial court erred in disregarding the parents' medical experts' diagnoses because a single, uniform medical condition could not explain every medical finding Yohan presented"). Dr. Ramaiah did not disregard the fact a fall on an outstretched arm could have caused Audrey's injuries. Dr. Ramaiah acknowledged that "all these multiple different ground-level falls *** could account for the multitude of injuries that she had if you took each of them individually." But Dr. Ramaiah explained why the existence of bilateral fractures was informative when she testified that "[m]ost of the time when kids fall they usually fall on one arm." We do not find that Dr. Ramaiah based her opinions on a constellation of injuries.

¶ 39 We also do not find that the trial court adopted a constellation of injuries theory when it found Dr. Ramaiah's opinions more credible than Dr. Sullivan's opinions. The trial court did not find abusive causation as to the clavicle fracture in this case and it found abusive causation as to the forearm injuries separately from the clavicle injury. The trial court also did not rely on a "constellation" of the multiple forearm fractures. The trial court's oral ruling illustrates that the trial court recognized, but rejected, Dr. Sullivan's conclusory testimony that the injuries could have occurred at different times. It is evident the trial court treated the forearm fractures as a single injury and, based on Dr. Ramaiah's testimony, which the court found more credible, that finding is not against the manifest weight of the evidence. Thus, the trial court did not relieve the State of its burden of proof under *Yohan K.* See *Yohan K.*, 2013 IL App (1st) 123472, ¶ 113 ("relying on a 'constellation' theory when there is no preponderance of evidence proving abusive causation as to each separate injury is akin to relieving the State of its burden of proof"). The trial court relied on the symmetry of the bilateral injuries to find abusive causation as to Audrey's forearm injuries, stating that "the fact that you would brace yourself identically and hit something just perfectly to cause the exact breaks doesn't seem to make much sense to me."

¶ 40 Michael argues the trial court used a "constellation of injuries" theory by another name when it based its decision on the fact Audrey's symmetrical bilateral forearm injuries were difficult to explain. We disagree. That the trial court relied on the symmetry of the injuries is not the same as relying on the existence of multiple injuries. Dr. Ramaiah testified that she had seen bilateral radius and ulna fractures very rarely and that in her personal experience she had only seen that type of injury in the context of an automobile accident. She also testified that she had only seen mirror-image fractures in the context of a "much more significant impact." She described how symmetric fractures could be inflicted on a child by bending the bones in the wrong direction. The trial court credited Dr. Ramaiah's testimony that, in sum, "you would need some force that would hit both arms perhaps at the same time that could cause that kind of [symmetrical] injury." The trial court found not credible the testimony that the symmetrical bilateral injury was not a significant fact because Dr. Sullivan was not able to recall a prior instance of its occurrence. Thus, we find that the trial court based its decision on the testimony and the relative credibility of the expert witnesses.

¶ 41 We also reject Michael's argument the trial court simply ignored Dr. Sullivan's opinions. "Though the trier of fact bears the responsibility of assessing the credibility of expert witnesses when they offer different opinions, there is an expectation that the conflict will be resolved by evaluating the relative merits of the experts and their opinions. [Citation.]" *Yohan K.*, 2013 IL App (1st) 123472, ¶ 111. Here, the trial court conscientiously evaluated the relative merits of the experts' opinions and clearly articulated its reasons for discounting Dr. Sullivan's

opinions. The court did not ignore Dr. Sullivan's testimony by stating "you don't see [symmetrical bilateral radius and ulna fractures] in a child of Audrey's age, *** it's unusual because a toddler 18 or 19 months old doesn't generate the type of force that you would need to cause that type of injury." The court was actually stating Dr. Ramaiah's reason for her opinion that Audrey's injuries were highly suspicious for an inflicted injury, which the trial court credited over Dr. Sullivan's contrary testimony.

¶ 42 Michael's reliance on Dr. Sullivan's testimony that he sees new radius fractures three to four times a week is misleading. Dr. Sullivan testified that he was referring to unilateral fractures when he made that statement. The trial court did not ignore Dr. Sullivan's testimony that forearm breaks in young children are produced accidentally in a standing child or in a child who is able to stand. Dr. Sullivan testified that the likelihood Audrey's injury was produced from nonaccidental trauma was only 1% or 2% "[b]ecause it's almost always produced accidentally in a standing child or in a child who is able to stand." The trial court did not find that testimony credible because Dr. Sullivan's only reason for that opinion was, in the court's words, "because I say it's an accident." On the contrary, Dr. Ramaiah testified how people usually fall (on one arm) and as to her experience that bilateral fractures are rare and typically seen only in high velocity impacts unless the injury was inflicted; whereas, Dr. Sullivan was unable to recall a single instance of an accidental mirror-image bilateral fracture of the radius and ulna in a child of Audrey's age. The court did not ignore Dr. Sullivan's opinions.

¶ 43 The trial court also concluded that the fact Audrey's fractured clavicle went untreated for a period of from two to six weeks constituted neglect. Dr. Sullivan testified clavicle injuries often go undetected by parents. Conversely, Dr. Ramaiah testified that Audrey's pain from the displaced clavicle fracture would have been readily noticeable to her caretakers, and the failure to notice the clavicle injury was medical neglect. The trial court explained its reasons for rejecting Dr. Sullivan's testimony based on common experience of taking care of the needs of a child of Audrey's age. The court noted that with an 18-month-old toddler, "in order to dress the child and bathe the child, obviously, you would have to help her move her arm." The court concluded that it was not believable that the primary caregiver doing those things could go for two weeks and not notice that there was something wrong with the arm. The court stated that it considered the fact that Drs. Sullivan and Ramaiah gave conflicting opinions but concluded that Dr. Ramaiah's testimony regarding that issue was more credible. The court found Dr. Sullivan's testimony that a reasonable caregiver could have missed that injury was not plausible based on Dr. Ramaiah's testimony. The court noted that Audrey's clavicle was displaced and stated that it was not believable that an injury of that nature would not be noticed. The court found that despite the evidence that Audrey was fussy it was not plausible that her caregiver would not notice, for the length of time at issue, that there was something awry with her arm. The court found that Dr. Sullivan's opinion was not credible and that Dr. Ramaiah was more plausible given that "at 18 months, you have to help the child get dressed. You have to help the child bathe."

¶ 44 The trial court did not rely on a constellation of injuries theory. The record contains evidence to prove abusive causation as to Audrey's bilateral radius and ulna fractures independently of her clavicle injury. We will not disturb a trial court's findings of physical abuse and medical neglect unless the findings are against the manifest weight of the evidence. A finding is against the manifest weight of the evidence when a contrary conclusion is clearly evident. In this case, a contrary conclusion to the court's judgment that Audrey was abused and

- 11 -

neglected is not clearly evident from our review of the record. Accordingly, the trial court's judgment is affirmed.

¶ 45                              CONCLUSION

¶ 46          For the foregoing reasons, the circuit court of Cook County is affirmed.

¶ 47          Affirmed.