NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 250242-U

No. 4-25-0242

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
July 24, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* H.W., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Fulton County |
|     Petitioner-Appellee, | ) | No. 23JA12 |
|     v. | ) | |
| Carrie M., | ) | Honorable |
|     Respondent-Appellant). | ) | Curtis S. Lane, |
| | ) | Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court.
Justices DeArmond and Grischow concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The appellate court reversed, finding the trial court's dispositional order
(1) changing the permanency goal to guardianship was against the manifest
weight of the evidence and (2) requiring reunification services when the goal had
been changed to guardianship was an abuse of discretion.

¶ 2    In December 2024, the trial court entered an adjudicatory order finding the minor,

H.W. (born November 2012), dependent and without the care necessary for her well-being

through no fault, neglect, or lack of concern by respondent, Carrie M., because H.W. refused to

attend school despite respondent's efforts and supportive services from the regional office of

education. Additionally, respondent stipulated to an immediate and urgent necessity finding

establishing the Illinois Department of Children and Family Services (DCFS) as temporary

custodian of the minor to facilitate her placement with the minor's maternal grandparents in an

effort to ensure school attendance. In February 2025, the court entered a dispositional order

wherein the permanency goal was changed to guardianship from return home, while court-

ordered services remained consistent with a goal of return home. On appeal, respondent argues the court erred when it changed the permanency goal to guardianship and ordered services consistent with a goal of return home. We agree and, for the reasons that follow, reverse the court's dispositional order and remand for further proceedings consistent with this order.

¶ 3                                          I. BACKGROUND

¶ 4          In May 2023, the State filed a neglect petition pursuant to section 2-3(1)(a) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(a) (West 2022)), alleging H.W. was a neglected minor who was not receiving a proper education as required by law. Specifically, the petition alleged, H.W., who resided with respondent, had "in excess of 35.5 unexcused absences during the 2022-2023 school year, thereby causing the minor to fall behind academically." A second count in the petition concerned H.W.'s father, who is not a party to this appeal.

¶ 5          On December 14, 2023, respondent admitted to the allegation H.W. was neglected by "failing to facilitate [her] education." The trial court subsequently entered a one-year continuance of adjudication under supervision order. The order permitted respondent to retain custody of H.W. and required respondent to comply with numerous conditions, including, *inter alia*, cooperating with the regional office of education and ensuring H.W. attend school daily.

¶ 6          On February 1, 2024, the parties appeared before the trial court for a status hearing. The State noted H.W. had only two absences from school since the last court date, both of which were excused.

¶ 7          On April 25, 2024, the parties appeared before the trial court again for a status hearing. The court admitted into evidence (1) a status report dated April 10, 2024, (2) school

attendance records, (3) an integrated assessment from February 2024, (4) a service plan from January 2024, and (5) a "Star of the Week" certificate H.W. had received from her physical education teacher the same day as the hearing.

¶ 8            The April 2024 status report noted H.W., who was 11 years old at the time, was enrolled in special education classes and received positive reviews from her teachers. The report stated she had "3.5" excused absence, no unexcused absences, and one tardy since January 2024. Two of the excused absences were due to doctor's appointments when H.W. had head lice, and another that was not explained in the report. The tardy was due to respondent having "car trouble." The report stated H.W. had "all passing grades" at the time. Additionally, the report stated respondent's living conditions for H.W. were safe and acceptable, she was employed, and she participated in mental health counseling. However, the report noted respondent had missed some appointments that required rescheduling. The integrated assessment and service plan were consistent with the status report.

¶ 9            On October 17, 2024, the parties appeared again before the trial court for a status hearing. A status report filed in September 2024 showed H.W. had two unexcused absences, one-and-a-half excused absences, and two tardies for the fourth quarter of the school year. She retained passing grades and graduated from fourth grade, which included numerous awards at graduation. The report stated H.W. started fifth grade in August and was "tardy for the first [four] days." Since then, the report noted, despite passing grades, she had "10 tardies and 7 absences in the first month of school." Based on the status report, the State said it intended to file a petition to revoke the continuance of adjudication under supervision order.

¶ 10            In November 2024, the State filed a petition to revoke the continuance of adjudication under supervision order, alleging respondent was required to ensure H.W. attended

school daily and that H.W. had not been attending school as required.

¶ 11    On December 5, 2024, a hearing on the State's petition was held. Amy Jones, the principal of H.W.'s school, testified that from the beginning of the current school year until the date of the hearing, there had been approximately 75 school days. Jones stated H.W. had 20.5 unexcused absences, 10 excused absences, and 30 tardies for the current school year. On cross-examination, Jones confirmed she "had conversations with [respondent] about efforts she had made to get [H.W.] to court—to school." Jones stated, "On the day specifically that [she] spoke with [respondent], [she] believe[d] [respondent] was trying to get [H.W. to school] on that day." The trial court admitted a copy of H.W.'s attendance record from August 16, 2023, to December 5, 2024, without objection. The matter was continued.

¶ 12    On December 18, 2024, the State filed an amended neglect petition. The amended petition added a count alleging H.W. was a dependent minor pursuant to section 2-4(1)(c) of the Juvenile Court Act. 705 ILCS 405/2-4(1)(c) (West 2024). The new count specifically alleged as follows:

> "[H.W.] is without care necessary for her well-being through no
> fault, neglect, or lack of concern by [respondent], in that the minor
> refuses to attend public school as required by the Illinois School
> Code, despite the efforts of her parent to make her attend public
> school, and despite supportive services being offered to her by the
> Regional Office of Education #26."

¶ 13    Respondent subsequently admitted to the new allegation contained in the amended petition. The trial court entered an adjudicatory order finding the minor to be dependent, vacated the continuation of adjudication under supervision order, and placed the

minor in the custody of DCFS. Respondent stipulated to a finding of probable cause of immediate and urgent necessity to name DCFS temporary custodian of H.W. Counsel for respondent explained to the court that respondent made the stipulation to facilitate DCFS placing H.W. with her maternal grandparents to ameliorate H.W.'s school attendance issues.

¶ 14 On February 13, 2025, the matter proceeded to a dispositional hearing. A dispositional report from January 2025, an integrated assessment from February 2024, and a service plan from October 2024 were admitted into evidence without objection. The dispositional report showed respondent maintained a suitable home, remained employed, and had been terminated from mental health counseling due to failures to "keep consistent appointments." The report stated H.W. had resided with her grandparents since December 19, 2024, and had weekly supervised visits with respondent. The report noted H.W.'s previous attendance issues and indicated respondent had "contacted the school, LSSI [(Lutheran Social Services of Illinois)], the truancy officer, and the police in efforts to get [H.W.] to go to school. However, [H.W.] continued to refuse to go to school." The report further noted H.W. had numerous failing grades, with a ".734" grade-point average, and she had also been terminated from mental health counseling "due to missed appointments." The report stated H.W. had no absences from school since placement with her grandparents. The report listed numerous recommendations, including that (1) respondent be ordered to complete a mental health assessment and any subsequent recommendations, (2) respondent be ordered to complete parenting classes, (3) H.W. be ordered to attend school regularly, and (4) H.W. be ordered to complete a mental health assessment and any subsequent recommendations. Lastly, the report recommended the permanency goal be set for "[r]eturn home within 12 months."

¶ 15 No further evidence was submitted by the parties.

¶ 16 The State requested the trial court order the recommendations as listed in the dispositional report. Regarding the permanency goal, the State said it would "leave the permanency goal determination to the Court," noting it was "a dependency, no-fault filing, but beyond that, that is the State's recommendations." The guardian *ad litem* (GAL) agreed and stated it would "defer to the Court" on the permanency goal. Respondent argued the permanency goal should remain for H.W. to return home within 12 months.

¶ 17 The trial court initially questioned Karla Hulvey, a caseworker for LSSI and the author of the dispositional report. Hulvey confirmed respondent could not get H.W. to attend school and she had failing grades. When asked why the goal was return home, Hulvey explained H.W., while under respondent's care, had been attending school, but the following school year, she "wouldn't go to school." Hulvey explained this precipitated an agreement between the parties in December 2024 that the case "would be a dependency, no fault," which is why she "had [the permanency goal] as return-home because there's a court order stating that isn't [*sic*] no fault of the mother." The court stated, "[s]o [H.W.] was causing the problems, and [respondent] couldn't get her to school." Hulvey responded, "I do not agree with—that it is just [H.W.] No, I do not agree with that."

¶ 18 The trial court ordered services as recommended in the dispositional report but changed the goal to guardianship. The court stated, "Nothing in the reports make sense on how this was [H.W.'s] fault where [respondent] couldn't get her to school. That doesn't make any sense. The evidence doesn't support that." The court said it would continue to allow services to be provided to respondent consistent with a reunification goal; however, it also stated the ordered services were "not necessarily in support of the guardianship goal."

¶ 19 In March 2025, respondent filed a motion to reconsider. At the hearing on

respondent's motion, the trial court denied the motion and explained its decision as follows:

"The court had an inquiry, which I remember, with [the GAL] about why in the world this would just be a return-home goal when the mother had the complete inability to get the child to school, leading not only from a revocation of the [continuance of adjudication under supervision] basically by agreement and admission to a dependency, but I also asked Ms. Hulvey why was the goal return home, and Ms. Hulvey indicated she did not agree with that goal, knowing—being the day-to-day caseworker and knowing the overall facts.

I believe I have wide latitude of discretion in selecting the goal which I found to be in the best interest of the guardianship goal. The court's basis for its ruling was, [respondent] clearly has the inability to do a basic task of getting [H.W.] to school. I don't care what services were provided. Those services did not allow [H.W.] to get to school. At one point, it did appear that [respondent] was successful, but then that fell off the wagon again.

The grandparents, without any rebutting evidence, showed that they have the ability to do, to do that. I don't believe [respondent] has the ability to control [H.W.] It may or may not be her fault, which, again, this was, by stipulation, a no-fault dependency. And I don't believe that she has the proper ability, especially if she stipulates to an immediate and urgent necessity for

removal from her home, to get [H.W.] to the basic requirements of going to school."

¶ 20    This appeal followed.

¶ 21                              II. ANALYSIS

¶ 22    On appeal, respondent argues the trial court erred when it (1) set the permanency goal as guardianship in the dispositional order and (2) ordered reunification services for respondent after the goal had been changed to guardianship.

¶ 23    The Juvenile Court Act requires the trial court to set a permanency goal for a minor following a dispositional hearing. 705 ILCS 405/2-22(1) (West 2024). The setting of a permanency goal is governed by section 2-28 of the Juvenile Court Act. *Id.* § 2-28. Under this section, the court may choose from eight permanency goal options. See *id.* § 2-28(2.3)(A)-(G). The court is required to "set a permanency goal that is in the best interest of the child." *Id.* § 2-28(2.4). "In determining that goal, the court shall consult with the minor in an age-appropriate manner regarding the proposed permanency or transition plan for the minor." *Id.* Additionally, "[t]he court's [permanency goal] determination shall include the following factors:

> "(A) Age of the child.
>
> (B) Options available for permanence, including both out-of-state and in-state placement options.
>
> (C) Current placement of the child and the intent of the family regarding subsidized guardianship and adoption.
>
> (D) Emotional, physical, and mental status or condition of the child.
>
> (E) Types of services previously offered and whether or not

the services were successful and, if not successful, the reasons the services failed.

(F) Availability of services currently needed and whether the services exist.

(G) Status of siblings of the minor.

(H) If the minor is not currently in a placement likely to achieve permanency, whether there is an identified and willing potential permanent caregiver for the minor, and if so, that potential permanent caregiver's intent regarding guardianship and adoption." *Id.*

¶ 24 Furthermore, "[p]rior to changing the goal to guardianship, the [trial] court shall consider the following:

"(i) whether the agency has discussed adoption and guardianship with the caregiver and what preference, if any, the caregiver has as to the permanency goal;

(ii) whether the agency has discussed adoption and guardianship with the minor, as age-appropriate, and what preference, if any, the minor has as to the permanency goal;

(iii) whether the minor is of sufficient age to remember the minor's parents and if the child values this familial identity;

(iv) whether the minor is placed with a relative ***; and

(v) whether the parent or parents have been informed about guardianship and adoption, and if appropriate, what preferences, if

- 9 -

any, the parent or parents have as to the permanency goal." *Id.* § 2-28(2.3)(C)(i)-(v).

¶ 25    We will not reverse a trial court's ruling at a dispositional hearing unless it is against the manifest weight of the evidence. *In re J.W.*, 386 Ill. App. 3d 847, 856 (2008). A finding is against the manifest weight of the evidence when the opposite result is clearly evident. *In re Audrey B.*, 2015 IL App (1st) 142909, ¶ 32.

¶ 26    Respondent argues the trial court failed to consider the factors listed in section 2-28(C) of the Juvenile Court Act before it changed the goal to guardianship. Specifically, she contends there was no evidence that any of the factors were observed by the court except for H.W.'s placement with a relative, her grandparents.

¶ 27    The State concedes the trial court did not address many of the factors from section 2-28(C) but argues the court's determination was not against the manifest weight of the evidence because it complied with the best-interest factors from section 2-28(2.4).

¶ 28    Because both parties contend different subsections of section 2-28 support their position, we must first determine which subsection controls this analysis. It is "a fundamental rule of statutory construction that where there exists a general statutory provision and a specific statutory provision, either in the same or in another act, both relating to the same subject, the specific provision controls and should be applied." *Knolls Condominium Ass'n v. Harms*, 202 Ill. 2d 450, 459 (2002). The issue on appeal in this case is the trial court's setting of a permanency goal generally, but, more specifically, it is the court's setting of the permanency goal to guardianship. Therefore, section 2-28(C) is more specific and is controlling in this case.

¶ 29    We agree with respondent the trial court's determination in favor of a guardianship goal was devoid of evidence for most of the factors from section 2-28(C). The

record shows the minor was placed with a relative, and it is clear from respondent's argument before the court at the dispositional hearing she was aware of the possibility of a guardianship goal and voiced her preference to have the goal remain return home. However, there was no evidence the agency discussed guardianship with H.W. or her grandparents prior to the goal being changed. There was also no evidence or consideration about H.W.'s age being sufficient to remember respondent or if she valued that familial relationship.

¶ 30 The record shows the trial court based its decision primarily on its view that respondent was incapable of ensuring H.W. attended school. While this view may or may not be correct, it, nonetheless, carries with it two significant problems in this case when it becomes the basis for changing the goal to guardianship.

¶ 31 The first problem is the trial court's decision is against the manifest weight of the evidence. Section 2-28(C) required the court to consider its factors prior to changing the goal to guardianship. There is simply no evidence the court considered these factors before changing the permanency goal to guardianship. "The conditions of a dispositional order must have some basis in the evidence." *In re K.S.*, 365 Ill. App. 3d 566, 570 (2006) (citing *In re Chyna B.*, 331 Ill. App. 3d 591, 597-98 (2002)).

¶ 32 The second problem is the trial court's dispositional findings are contrary to its own adjudicatory findings.

¶ 33 At the dispositional hearing, Hulvey, the caseworker, told the trial court she did not agree H.W. was solely at fault for failing to attend school. The court concluded there was no evidence to support the contention it was H.W.'s fault she failed to attend school as required. At respondent's motion to reconsider hearing, the court further clarified the basis for its ruling was because respondent was unable to get H.W. to school. Charitably, the evidence implies someone

- 11 -

(or, perhaps, some issue) other than H.W. alone has made it such that she has failed to attend school regularly. The court ran with this inference to conclude respondent was unable to ensure H.W. attended school.

¶ 34 Recall, however, H.W. was adjudicated dependent. As part of that adjudication, certain facts were established, including that she was without the care necessary for her well-being and *she* refused to attend school. Moreover, it was also established factually that neither of these issues were the fault of respondent or supportive services offered by the regional office of education. Therefore, as a matter of fact, neither the court nor the State can have it both ways; that is, H.W.'s attendance failures cannot both be the fault of and not the fault of respondent.

¶ 35 Respondent further stipulated to an immediate and urgent necessity finding to permit temporary custodianship by DCFS to facilitate the minor's placement with H.W.'s grandparents in an effort to improve her school attendance. The court took this stipulation to cut against respondent by showing she was incapable of ensuring H.W. attended school. However, respondent's stipulation does not obviate the adjudicatory findings. In fact, it also supports the adjudicatory finding that respondent had gone to great efforts to ensure H.W.'s attendance, including the facilitation of H.W.'s placement with her grandparents to improve her school attendance. Either way, the adjudicated findings from the State's amended petition established a baseline set of facts that cannot be overridden or ignored by the court to achieve some ulterior goal.

¶ 36 The Juvenile Court Act "contain[s] strict procedural requirements *** that favor[ ] parents' superior right to the custody of their own children." *In re E.B.*, 231 Ill. 2d 459, 464 (2008). "When a [trial] court exercises its authority, it 'must proceed within the confines of that law and has no authority to act except as that law provides.' " *Id.* (quoting *People v. Brown*,

225 Ill. 2d 188, 199 (2007)). The statutory confines placed on a court prohibit it from rejecting or expanding "its statutory authority despite the desirability or need for such action." (Internal quotation marks omitted.) *Id.* "Any action the trial court takes that is outside the statute's stricture is void." *Id.*

¶ 37    When the trial court changed the goal to guardianship because it found respondent was unable to ensure H.W. went to school, the court was effectively stating it was respondent's fault. This directly contradicts the adjudicated basis for this case, which found H.W.'s failure to attend school was not the fault of respondent. Therefore, the court's determination to change the permanency goal to guardianship, for this reason, was also against the manifest weight of the evidence.

¶ 38    Lastly, respondent argues the trial court's dispositional order contravenes section 2-28(2.3) because it ordered reunification services despite the permanency goal having been changed to guardianship. We agree.

¶ 39    While we are reversing the trial court's dispositional order and, thus, the permanency goal it had set, we take this opportunity to clarify further what we cited earlier: "When a court exercises its authority, it 'must proceed within the confines of that law and has no authority to act except as that law provides.' " *Id.* (quoting *Brown*, 225 Ill. 2d at 199). When a court selects certain permanency goals, and, in this case specifically, a guardianship goal, the Juvenile Court Act states DCFS "shall not provide further reunification services" and must "provide services consistent with the goal selected." 705 ILCS 405/2-28(2.3)(G) (West 2024). The use of "shall" in this section "is generally indicative of mandatory intent." *People v. Robinson*, 217 Ill. 2d 43, 49 (2005). Here, the court was aware when it selected the guardianship goal that the services provided to respondent were no longer consistent with the chosen goal.

This was error.

¶ 40        While we ordinarily review a trial court's dispositional order under the manifest weight of the evidence standard, we may also review a court's dispositional order under an abuse of discretion standard when it selects "an inappropriate dispositional order." (Internal quotation marks omitted.) *In re K.B.*, 2012 IL App (3d) 110655, ¶ 23. Accordingly, we find the court abused its discretion when it ordered reunification services for respondent after it had changed the permanency goal to guardianship. See 705 ILCS 405/2-28(2.3)(G) (West 2024) ("Where the court has selected a permanency goal other than (A), (B), or (B-1), [DCFS] shall not provide further reunification services."); see also *id.* § 2-28(2.3)(C) (classifying subsection (C) as the permanency goal of guardianship).

¶ 41                          III. CONCLUSION

¶ 42        For the reasons stated, we reverse the judgment of the trial court and remand the matter for further proceedings consistent with this order.

¶ 43        Reversed and remanded.